**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

BREANNA POST, on her own behalf and on behalf of all others similarly situated,

Plaintiff,

vs.

DOONEY & BOURKE, INC.,

Defendant.

Case No. 2:26-cv-00249-LK

Honorable Judge Lauren King

PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

## I. INTRODUCTION

Washington's Commercial Electronic Mail Act (CEMA) and Consumer Protection Act (CPA) prohibit commercial emails containing "false or misleading information in the subject line." RCW § 19.190.020(1)(b); *see id.* § 19.190.030(1)(b) (CEMA violations are CPA violations). Faced with this clear prohibition, recently affirmed in a decision from the Supreme Court of Washington, *see Brown v. Old Navy, LLC*, 4 Wash. 3d 580 (2025), Defendant Dooney & Bourke, Inc. ("Dooney") simply decided to ignore it.

Dooney relentlessly spams consumers' inboxes with email subject lines larded with caps and emoji that herald the beginning, middle, and merciful end of promotions—*falsely*. "Only Hours Left: Cyber Monday Ends Soon," when the "hours" continued the next day. Dkt. 1-2 ("Compl."), ¶¶ 78-81, 97. "Last Chance! Summer Fun Ends Tonight!" the day before Dooney sent another email, exclaiming, "Surprise! One More Day to Shop Summer Fun." *Id.* at ¶¶ 55-58. And so on. *Id.* at ¶¶ 30-83, Ex. A.

Feigned mistakes, false deadlines, urgent warnings. When deployed to deceive consumers, these tactics are known as false limited time messages, false time scarcity claims, or false urgency claims, *id.* ¶¶ 29-31, and are a "common way online marketers manipulate consumer choice by inducing false beliefs." *Id.* ¶ 29. Marketers use them because they *work*. *See id.* ¶¶ 29-38. They cause consumers to narrow their purchasing decisions, leaving them worse off. *See id.* As deployed by Dooney, these tactics are straightforward violations of CEMA and thus the CPA.

Dooney's Motion to Dismiss (Dkt. 17, "Mot.") seeks to distract this Court with irrelevancies and inapposite application of governing standards. Separating the wheat from the chaff: Dooney has no facial attack against Plaintiff's well pled allegations of material deception under CEMA, aligned with the Washington Supreme Court's opinion in *Brown*, and Dooney's

preemption argument misapplies the leading decision in *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009) and contravenes several recent decisions by this Court. *E.g.*, *Ma v. Nike, Inc.*, No. C25-1235JLR, __ F. Supp. 3d __, 2026 WL 100731 (W.D. Wash. Jan. 14, 2026); *Harrington v. Vineyard Vines, LLC*, No. C25-1115 TSZ, __ F. Supp. 3d __, 2025 WL 3677479, at *1 (W.D. Wash. Dec. 18, 2025), *reconsideration denied sub nom.* 2026 WL 125134 (W.D. Wash. Jan. 16, 2026); *Kempf, et al.*, v. *FullBeauty Brands Ops.*, No. C25-1141 TSZ, 2026 WL 395677, at *4-*5 (W.D. Wash. Feb. 12, 2026); *Agnew, et al. v. Macy's Retail Holdings, Inc.*, 2:25-CV-02006-JHC (W.D. Wash. March 18, 2026), Dkt. 30; *see also State of Washington et al. v. Ulta Salon Cosmetics & Fragrance, Inc.* ___ F. Supp. 3d ___, 2026 WL 571122 *3 (E.D. Wash. February 27, 2026).

The Court should deny the motion.

## II. JURISDICTION

While Dooney is incorrect that Plaintiff was required to plead reliance, *see infra* Section IV(A)(ii), the parties agree that Plaintiff has Article III standing. Mot., 4-5. A plaintiff may satisfy the injury-in-fact requirement by alleging intangible harms. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete"). Actions to remedy "invasions of privacy, intrusion upon seclusion, and nuisance have long been heard by American courts, and the right of privacy is recognized by most states." *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). As with unwanted calls and texts, the receipt of unwanted or unlawful spam emails is an "unwanted intrusion and nuisance" on consumers. *See id.* (plaintiff established concrete injury-in-fact from "unsolicited telemarketing phone calls and fax advertisements" on Telephone Consumer Protection Act claim); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954-55 (9th Cir. 2009).

These are the types of harm which CEMA seeks to prevent. Just as the TCPA "establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent[,]" *Van Patten* at 1043, CEMA protects Washington residents from the nuisance, confusion, and annoyance caused by deceptive spam emails. CEMA specifically recognizes that subject headings of spam emails are the only means of assessment for consumers hoping to temper the barrage of value-less and time-wasting communications. As the Supreme Court of Washington opined, construing the meaning and purpose of CEMA:

> CEMA sought to give consumers relief from commercial spam e-mail by requiring accuracy and truthfulness in the subject lines of such e-mails. The legislature sought to achieve this objective by targeting an e-mail's header and subject lines: the two pieces of information consumers first glean when faced with the choice of deleting a message or engaging with its content.

*Brown*, 4 Wash. 3d at 590–91. The Ninth Circuit emphasized the bothersome nature of spam email in *Gordon*, finding: "spam is largely considered a nuisance and a source of frustration to e-mail users who. . . must wade through inboxes clogged with messages peddling assorted, and often unwanted, products and services. *The rising tide of spam poses an even greater problem to businesses, institutions, and other entities through network slowdowns, server crashes, and increased costs.*" *Gordon*, 575 F.3d at 1044–45 (emphasis added).

Thus, the Ninth Circuit has spoken on this issue of nuisance injury,[1] *supra Van Patten*, 847 F.3d 1037, and Plaintiff has Article III standing.

## III. APPLICABLE STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the well-pled

---

[1] Defendant points to a Notice of Appeal in *Montes v. Catalyst Brands LLC*, No. 2:25-cv-00281-TOR (E.D. Wash. Dec. 19, 2025) to assert the Ninth Circuit "is currently considering this specific issue and is expected to resolve it shortly." Mot., 5 n. 1. But, as discussed *supra*, in *Van Patten*, the Ninth Circuit has answered whether Article III standing can be based on nuisance injury from substantively identical, unsolicited calls, texts and faxes, a decision that controls here.

factual allegations are taken as true and all reasonable inferences are drawn in plaintiff's favor. *Littlejohn v. Kaiser Fdn. Health Plan of Wash.*, 2024 WL 4451955, at *3 (W.D. Wash. Oct. 9, 2024). The motion must be denied if the complaint states a claim that is "plausible on its face." *Id.* Where, as here, defendant seeks Rule 12(b)(6) dismissal based on an affirmative defense, it must show that the "allegations in the complaint suffice to establish the defense" and the defense is "apparent from the face" of the complaint. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (quotations omitted).

## IV. ARGUMENT

### A. Dooney's arguments that CEMA is preempted fail.

Simply, CEMA is not preempted by the federal CAN-SPAM Act, 15 U.S.C. §§ 7701–7713 ("Act"). The Act's plain text, its legislative history, the Ninth Circuit's decision in *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009), and cases decided before and after *Gordon* compel this conclusion. The Court need look no further than the plain text::

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, *except to the extent that any such statute, regulation, or rule prohibits falsity* ***or*** *deception in any portion of a commercial electronic mail message or information attached thereto*.

15 U.S.C. § 7707(b)(1) (emphases added).

Application of this plain text to CEMA is straightforward. CEMA prohibits sending commercial email that "[c]ontains false or misleading information in the subject line." RCW § 19.190.020(1)(b). By prohibiting "false or misleading" subject lines in commercial emails, *id.*, CEMA "prohibits falsity or deception" in some part of or information attached to commercial emails. 15 U.S.C. § 7707(b)(1). By its plain terms, therefore, the Act does not preempt Plaintiff's CEMA claims. Moreover, this "narrow" textual preemption analysis is "guided" by "a

presumption against supplanting the historic police powers of the States" unless "that [is] the clear and manifest purpose of Congress." *Gordon*, 575 F.3d at 1060 (citations omitted). So, the idea is to construe the plain text and limit that construction to Congress' manifestly clear purpose.

The legislative history is clear. The Report of the Senate Committee on Commerce, Science, and Transportation described the effect of the Act as follows: "[A] State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, *a State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted*." S. Rep. No. 108-102, at 21 (emphasis added). The Report makes clear that Congress did not intend § 7707(b)(1) preemption to reach everything short of common law fraud, and indeed expressly endorses the very claims brought here: claims based on "a State law prohibiting … deceptive … subject lines … in commercial email" (*id.*)—directly contradicting Dooney's assertions that the CAN-SPAM exception applies only to claims sounding in common law fraud. Mot., 2, 5-6, 8, 12.

Court after court, before and after the Ninth Circuit's decision in *Gordon*, has concluded: statutory and common law claims that attack "falsity and deception" (§ 7707(b)(1)) broadly in commercial email are not preempted. Attention to *Gordon*'s actual reasoning and holding, rather than loose citation to its dicta, reveals why. The question was "[w]hether the exception language of § 7707(b) permits states to prohibit e-mail activity that is *not* unfair or deceptive." 575 F.3d at 1062 n. 21. Unsurprisingly, the answer was no. *Gordon* construes CEMA's "point of origin" provision, which prohibits "misrepresent[ing] or obscur[ing] any information in identifying the point of origin or the transmission path" of commercial email. RCW § 19.190.020(1)(a); *see Gordon*, 575 F.3d at 1058. As construed by the court, and contrary to Dooney's representation otherwise (Mot., 7), the court found that CEMA's *point-of-origin provision*—not the statute

itself—reaches "a vast array of nondeceptive acts and practices," including "unintentional clerical errors, imperfect representations, or immaterial misstatements." *Id.* at 1059 (quotations and citation omitted).

The CAN-SPAM Act, by contrast, as interpreted in light of its text, structure, and purpose, *see id.* at 1061, does not authorize liability for "bare immaterial error," *id.* (quoting *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 359 (4th Cir. 2006)), or "immaterial inaccuracies or omissions." *Id.* at 1062. Rather, the Act restricts state regulation to the field of "traditionally tortious or wrongful conduct." *Id.* (quoting *Omega*, 469 F.3d at 354).

Under this materiality standard, the plaintiff's claims were preempted. The Ninth Circuit found "nothing inherently deceptive" about "fanciful" domain names, *Gordon*, 575 F.3d at 1062, 1064, and rejected an inapposite argument that defendant's or a client's full name must "expressly appear" in "from" fields. *Id.* If CEMA imposed such a "labeling requirement," the court explained, it "clearly" fell outside the exception from preemption. *Id.* So *Gordon* focused on the materiality of the alleged deception, and on that question, the plaintiff's claims failed.

*Gordon* and the cases applying it thus explain the import of "traditionally tortious or wrongful conduct," 575 F.3d at 1062, in the preemption analysis, and give the lie to Dooney's characterization of Plaintiff's CEMA claims as attempts to impose "strict liability." *See* Mot., 17, 19-20, 23. The court invoked "traditionally tortious or wrongful conduct" to emphasize that the exception to CAN-SPAM preemption for state laws prohibiting "falsity *or* deception" does not encompass "liability for immaterial inaccuracies or omissions." *Id.* at 1062. It did not make any findings on, offer any analysis regarding, or even *mention* "common law fraud" in its discussion of the materiality requirement for the exception to CAN-SPAM preemption. *See generally Gordon*, 575 F.3d 1040.

Thus, under the Ninth Circuit's governing decision in *Gordon*, not the Fourth Circuit's decision in *Omega* (Mot., 6-8), a defendant simply must show it didn't do anything *wrong* to merit preemption, in light of the state standard to be applied to its conduct, viewed against the backdrop of what has traditionally been considered wrongful:

> The only burden [CEMA] places on spammers is the requirement of truthfulness, a requirement that does not burden commerce at all but actually facilitates it by eliminating fraud and deception. Spammers must use an accurate, nonmisleading subject line. . . . While spammers incur no costs in complying with the Act, they do incur costs for noncompliance, because they must take steps to introduce forged information into the header of their message.

*State v. Heckel*, 143 Wash. 2d 824, 836-37 (2001) (*en banc*)

**i. Dooney's deceptions are more than bare immaterial errors.**

The only question, therefore, is whether it is "apparent from the face" of Plaintiff's Complaint, *Sams*, 713 F.3d at 1179, that the misrepresentations she complains of are merely "bare immaterial error[s]." *Gordon*, 575 F.3d at 1061 (quotations omitted). It is not. Plaintiff is not complaining of "fanciful" domain names or "from" fields that fail an invented "labeling requirement." *Id.* at 1063–64. To the contrary, Plaintiff complains of Dooney's barrage of emails laden with false subject lines—*i.e.*, its false time-scarcity tactics—that are material to the behavior of ordinary consumers.

As alleged, "[f]alse time scarcity claims harm consumers by manipulatively distorting their decision-making to their detriment." Compl. ¶ 36. As one report cited in the Complaint concludes, "[f]alse or misleading scarcity claims can change the behaviour of consumers." Compl., ¶ 31 (citing U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 27 (2022)). Specifically, "[f]alse scarcity claims are psychologically effective because, as 'considerable evidence' suggests, 'consumers react to

scarcity and divert their attention to information where they might miss opportunities.'" Compl. ¶ 33. One study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at ¶ 37. *Littlejohn*, 2024 WL 4451955, at *3 (fact pleadings "accept[ed] as true" with "reasonable inferences [drawn] in favor" of Plaintiff).

All of this accords with the well-worn federal law of materiality, not to mention common sense. "Whether in tort or contract law," materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Kousisis v. United States*, 145 S. Ct. 1382, 1396 (2025) (applying wire fraud statute). A fact is material "if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." *Id.* (citation omitted). Representations about the timing and duration of sales, discounts, and other special offers are, at bottom, representations about prices. If a consumer is faced with "One More Day to Save: Up to 70% Off" or "Only Hours Left: Cyber Monday Ends Soon" or "Hours Left: The Spring Fling Sale Ends Tonight," the consumer must decide whether to take advantage of the deal by purchasing during that "one day" or those mere "hours left," after which she loses the opportunity. Compl., ¶¶ 51, 72, 74, 78 95, 96, 97; *see id.* at ¶¶ 39-83, Ex. A. And price is obviously a material fact—perhaps *the* material fact—affecting the behavior of consumers. *See* Compl. ¶¶ 32- 35. If a consumer is in the market for a product or products she believes will cost more tomorrow, she will naturally "attach importance," *Kousisis*, 145 S. Ct. at 1396, to the fact that the price will be less if she buys it today.

Dooney's materiality assertions have nothing to do with that requirement. Mot., 9-12. *First*, it points to no apposite support for the argument that Plaintiff must make a purchase. Mot., 8; *see infra* n. 4 (fraud cases). This is a case about CEMA injury and deception, not one about

reliance under fraud, discussed *infra* pp. 13-14.

*Second*, Dooney aptly points to cases that stand for the proposition that "a misrepresentation is material if it concerns a matter to which a reasonable person would attach importance in determining his or her choice of action." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 n. 5 (2016) (cited by Defendant) (citation and quotations omitted); *see also Kousisis*, 145 S. Ct. at 1396 (same). And indeed, this State's high court has already found that CEMA focuses on "representations *of fact*—like *the duration or availability of a promotion*, its terms and nature, the cost of goods" that are the kinds of "*facts* [that] *Washington residents would depend on in making their consumer decisions*." *Brown*, 4 Wash. 3d at 596 (emphasis added). So Dooney's misrepresentations regarding the "duration or availability" or the "terms" of a sale, discount or promotion, *are* matters on which "a reasonable person would attach importance in determining his or her choice of action." *Universal Health Servs.*, 579 U.S. at 193 n. 5. *See also id.* at ¶¶ 29-38 ("[f]alse or misleading scarcity claims can change the behaviour of consumers"); *id.* at ¶¶ 93-100 (Plaintiff received emails with, *e.g.*, "Last Call!" and "One More Day to Save" headlines, for deals available the very next day).

*Finally*, Dooney's *fraud* cases are inapposite to this analysis,[2] and the court's decision on the CPA claim in *Brummett* largely turned on the plaintiff's failure to "target the creator of this alleged deception," who was not the defendant. *Brummett v. Washington's Lottery*, 171 Wash. App. 664, 678 (2012) (cited by Defendant). Moreover, the single-sentence finding that the phrase "going fast" was not materially deceptive, *id.*, is refuted by the later holding, in *Brown*, that "'representations of fact[s]–*like the duration or availability of a promotion. . .*' are subject to CEMA's subject-line standards." *Harrington*, 2025 WL 3677479, at *1 (quoting *Brown*, 4 Wash.

[2] *See infra* n. 4.

3d at 595–96).

Dooney is a "sophisticated commercial enterprise" that has "engaged in persistent marketing through mass email campaigns across the United States." Compl. ¶ 84. Its email marketing platform ("Listrak") enables it to, *inter alia*, track how many recipients engage with its marketing materials and to what extent. *See id.* ¶ 88. And email subject lines offer limited space within which Dooney can communicate "above the fold" messages that come to consumer attention even if the emails are immediately deleted or their contents ignored. Why, then, would Dooney choke its consumers' inboxes like coffee grounds in a clogged sink with email after email announcing "One More Day to Save" or "Last Chance!" or "Only Hours Left" if those representations constitute mere immaterialities? The only plausible answer is, of course it would not. Dooney would not waste valuable marketing dollars on marketing messages unless they worked. And Dooney's false-urgency tactics work because they exploit well documented features of consumer psychology and behavior. *See id.* at ¶¶ 29-83. In other words, Dooney's tactics work because they misrepresent facts to which consumers "attach importance." *Kousisis*, 145 S. Ct. at 1396.

Recent decisions in this District affirm the application of the CAN-SPAM exception to CEMA in this context. *Nike, Inc.*, 2026 WL 100731, at *2 (citing *Gordon*, 575 F.3d at 1062). Here, as in *Nike*, Plaintiff alleges a "pattern of Nike sending Washington residents commercial e-mails with subject lines containing allegedly false or misleading information regarding the duration or availability of sales promotions, falling directly under CEMA's subject-line provision which fits under the rights reserved to states within the CAN-SPAM Act's savings clause." *Id.* *See also Harrington*, 2025 WL 3677479, at *1 (CEMA not preempted by CAN-SPAM Act); *FullBeauty Brands*, 2026 WL 395677, at *4-*5 (same); *Macy's Retail Holdings*, 2:25-CV-02006-

JHC, Dkt. 30, pp. 1-3 (same); *see also Ulta*, 2026 WL 571122 *3. These cases are recent, on point, and dispositive.

Dooney's attempt to distinguish *Harrington* and *Nike* misses the forest for the trees. While the decisions acknowledged that a different CEMA provision was at issue in *Gordon*, they cited to the Ninth Circuit's decision in support of the core finding that a "state law that prohibits 'fraudulent or deceptive headers, subject lines, or content in commercial e-mail[s] would not be preempted' by the CAN-SPAM Act." *Nike*, 2026 WL 100731, at *2 (quoting *Gordon*, 575 F.3d at 1062), as well as the central holding that "because CEMA's subject-line provision prohibits only 'falsity' or 'deception' in the subject-line of commercial e-mails, it 'falls squarely within this area reserved to the States[.]'" *Id.* (quoting *Harrington*, 2025 WL 3677479, at *1). Moreover, the court's findings in *Harrington* that CEMA liability does not encompass "mere puffery," but looks to "representations of fact–like the duration or availability of a promotion, its terms and nature, the cost of goods, and other facts," *id.* (quoting *Brown*, 4 Wash. 3d at 589 & 594), is just another way of saying that it does not hold defendants liable for "immaterial inaccuracies or omissions." *Gordon*, 575 F.3d at 1062.

In any event, materiality is a complex mixed question of law and fact "typically … resolved by juries." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). Any doubts as to the materiality of Dooney's misrepresentations are to be doubly resolved against Dooney: once because it is not Plaintiff's burden to plead materiality, but Dooney's burden to show Plaintiff has pleaded herself out of court with immaterialities, *see Sams*, 713 F.3d at 1179; and twice because Plaintiff should be afforded the benefit of fact and expert discovery to demonstrate the plausible inference that Dooney's misleading subject lines impact consumer behavior. And anyway, at this stage, the Court must draw reasonable inferences in Plaintiff's favor. *See Littlejohn*, 2024 WL

4451955, at *3. Plaintiff's claims under CEMA stand.

**ii. Dooney's non-existent preemption standard does not apply.**

Having invented a non-existent "common law fraud" pleading requirement under *Gordon*, Dooney next asserts that Plaintiff's CEMA claim must meet the elements of common law fraud. Mot., 8-18. But the Ninth Circuit's reference to "traditionally tortious or wrongful conduct" never once invokes the elements of common law tort theories, like, *e.g.* fraud.[3] As described *supra* Section III(C)(i), *Gordon* and its progeny stand for the incorporation of *materiality* under common law tort theories to invoke preemption. They do not stand for an explicit adoption of the elements of a *different* law or standard other than that invoked by the exempted state law itself. *Gordon*, at 575 F.3d at 1063. Rather, as described by the court, the CAN–SPAM Act "left the individual states free to extend traditional tort theories such as claims arising from fraud or deception to commercial e-mail communication." *Id.* So, the *states* get to enact laws that *extend* traditional prohibitions against fraud *and* deception, the latter, of course, being substantively discrete from the former. Otherwise, as the court in *Consumerbargaingiveaways* reasoned: use of the disjunctive references to "falsity *or* deception" in fact, "suggest[s] [a] broader application," not one "limited *just* to common-law fraud and other similar torts." 622 F. Supp. 2d at 942.

So Dooney is wrong that Plaintiff is required to "plead[ ] the essential elements of a traditional fraud" claim to "survive preemption." Mot., 12-14. Plaintiff is not required to

[3] *See, e.g.*, *Asis Internet Servs.*, 2009 WL 4723338, at *3 (no "need to plead reliance and damages in order to avoid preemption"); *Asis Internet Servs*, 617 F. Supp. 2d at 993 ("declin[ing]" to "restrict . . . 'falsity or deception' to encompass only common-law fraud"); *Consumerbargaingiveaways*, 622 F. Supp. 2d at 944 (same); *Smith*, 2014 WL 12577598, at *2–3 (same); *Wagner*, 2014 WL 889483, at *3–4 ("showing of reliance and damages" is "not necessary"); *Hypertouch*, 123 Cal. Rptr. 3d at 27 (same); *Hoang*, 2010 WL 1340535, at *4 ("not required" to "allege he relied to his detriment" on false or misleading statement).

demonstrate "scienter," a requirement under *fraud* claims.[4] *See Wright v. Lyft, Inc.*, 406 P.3d 1149, 1153–55 (Wash. 2017) (elements of CPA and CEMA claims do not include intent).

Nonetheless, a demonstrably reasonable inference from pleadings that Dooney asserted "Final Hours", "Last Call," "Ends TONIGHT" and "Last Chance!" as to deals it continued the next day, or shortly thereafter, is that Dooney *knew* the deal would be "extended." Compl., ¶¶ 39-83. Otherwise, how could it systematically implement the very deals it was advertising, and then advertise those deals to consumers across the U.S.? *Littlejohn*, 2024 WL 4451955, at *3 (fact pleadings "accept[ed] as true" with "reasonable inferences [drawn] in favor" of Plaintiff). Of course, even under heightened fraud claims—*not applicable* here—one need only plead a "strong inference" of knowledge. *See, e.g.*, *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). This makes sense: at the pleading stage, a plaintiff has little-to-no way of accessing what the defendant *knows*. So Dooney is wrong even under the standard for pleading fraud—an inapposite standard on Plaintiff's CEMA and CPA claims, which do not require intent. *Wright*, 406 P.3d at 1153–55.

And again, because *Gordon* and the CAN-SPAM exception to preemption *do not impose* common law fraud elements on CEMA, there is no requirement to plead reliance here.[5] Dooney

---

[4] Dooney's effort to invoke common law fraud turns on misrepresenting the *Gordon* decision and relying on cases about fraud. Mot., 6-18 (citing, *e.g.*, *Elcon Const., Inc. v. E. Washington Univ.*, 174 Wash. 2d 157, 166-167 (2012) (under *fraudulent inducement* claim, court found the alleged misrepresentations "*not relevant*"); *Martin v. Miller*, 24 Wash. App. 306, 309 (1979) (on *fraud claim*, plaintiffs must show that "representations were material to the plaintiffs' decision to enter into . . . agreement"); *Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*, 76 F.4th 1164, 1169 (9th Cir. 2023) (quoting the "procedural history" portion of a decision regarding a False Claims Act challenge, where the jury was asked to assess, *inter alia*, "whether 'the false or fraudulent aspect of the claim' was 'material to [the plaintiff's] decision-making'"); *Isomedia, Inc. v. Spectrum Direct, Inc.*, No. C08-1733JLR, 2009 WL 10676391, at *4 (W.D. Wash. May 27, 2009) (on *fraud* claim, allegation not sufficient to meet *inapposite* reliance requirement)).

[5] *See, e.g.*, *Asis Internet Servs. v. Subscriberbase Inc.*, 2009 WL 4723338, at *3-*4 (N.D.

misses the point in its argument that cases like *Asis Internet Servs. v. Subscriberbase* are distinguishable. There, the court was not looking to the pleading requirements of any state law when it construed *congressional* language for *exempting* state statutes from preemption. 2009 WL 4723338, at *3-*4. And as it found:

> This Court agrees with those courts that have read the terms "falsity or deception" broadly, thereby saving more than just common law fraud claims and narrowing the preemptive effects of the CAN–SPAM Act. In particular, this Court agrees that Congress's use of the word "fraud" elsewhere in the section, and the CAN–SPAM Act's references to the word "deception" as used in the FTC Act, invite this broader reading. Plaintiffs therefore do not need to plead reliance and damages in order to avoid preemption of their claims.

*Id.* at *3 (citation omitted). As amply described *supra*, *Gordon*'s focus on materiality aligns with these courts' findings that the exception for "falsity or deception" prohibitions does not equate to "common law fraud," a term never once referenced by *Gordon*—notwithstanding Dooney's considerable effort to assert otherwise.

Nor should the Court accept Dooney's invitation to read into *Gordon* the findings and conclusions made in *Omega*. Throughout its brief, Dooney consistently quotes its favored (*Omega*) opinion, while misrepresenting that findings and statements in that case were co-signed by the court in *Gordon*. *See, e.g.*, Mot., 14-17. And while the Ninth Circuit extensively reviewed the decision by its sister circuit court, it did not wholly adopt the opinion or align with statements

---

Cal. Dec. 4, 2009); *Asis Internet Servs. v. Vistaprint USA, Inc.*, 617 F. Supp. 2d 989, 993 (N.D. Cal. 2009); *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 944 (N.D. Cal. 2009); *Smith v. Anastasia Inc.*, 2014 WL 12577598, at *2–3 (S.D. Cal. Sept. 15, 2014); *Wagner v. Spire Vision*, 2014 WL 889483, at *3–4 (N.D. Cal. Mar. 3, 2014); *Balsam v. Trancos, Inc.*, 138 Cal. Rptr. 3d 108, 122 (Cal. Ct. App. 2012); *Hypertouch, Inc. v. ValueClick, Inc.*, 123 Cal. Rptr. 3d 8, 27 (Cal. Ct. App. 2011), Indeed, one district court *reversed* its prior decision in light of *Gordon*. *Hoang v. Reunion.com, Inc.*, No. C-08-3518 MMC, 2010 WL 1340535, at *4 (N.D. Cal. Mar. 31, 2010) (vacating pre-*Gordon* decision) (plaintiff "not required" to "additionally allege he relied to his detriment" on false or misleading statement to avoid preemption.).

regarding, *e.g.*, reliance under fraud and "strict liability standard[s]" that Dooney attempts to associate with *Gordon*. Indeed, *Gordon* never once mentions fraud "reliance" or "strict liability." *Compare* Mot., 14-17 *with Gordon*, at 575 F.3d at 1061-65.

Neither the CAN-SPAM Act nor *Gordon* require Plaintiff to plead common law fraud for her CEMA claims to be exempted from preemption. And because Plaintiff's claims do allege *material* harm under *Gordon* and *Brown*, they are exempted.

**iii. There is no conflict preemption here.**

In a last-ditch effort to preempt Plaintiff's CEMA claims, Dooney argues that—even if CEMA comes under the CAN-SPAM savings clause, it is nonetheless subject to conflict preemption. Mot. 18-20. This argument fails because CEMA operates in harmony with CAN-SPAM and falls squarely within the category of state laws which Congress sought to preserve.

While it is true, a savings clause can't entirely *save* a state statute from conflict preemption, Dooney's own case law stands for the proposition that an otherwise exempted state law conflicts with federal law where, for example, it "upset[s] [a] careful regulatory scheme established by federal law," *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000) (citations omitted), or federal law "exclusive[ly]" governs the matter. *Meyer v. United Healthcare, Ins. Co.*, 840 F. App'x 174, 176 (9th Cir. 2021). This aligns with conflict preemption analysis, which looks to "whether a party's compliance with both federal and state requirements is *impossible* or whether, in light of the federal statute's purpose and intended effects, state law poses *an obstacle to the accomplishment of Congress's objectives*." *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1164 (9th Cir. 2008) (emphasis added). So, a *conflict* means exactly that: execution of the state law must *impede* execution of the federal law.

With this understanding, Dooney's argument has no ground. It fails to point to any true

"impossibility" or "obstacle" that CEMA poses to ensuring that the objectives of the CAN-SPAM Act are effected. *See generally* Mot., 18-20. There is no "impossibility" conflict because a party sending commercial marketing emails complies with both CAN-SPAM and CEMA when they simply avoid deceptive email practices. Dooney vaguely references purported impacts on the "national standard" established by CAN-SPAM. But surely any national standard established by Congress included the congressional *intent* to *permit* "[s]tate law[s] prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail." S. Rep. No. 108-102, at 21.

As *Gordon* makes clear, "[t]he CAN–SPAM Act established a national standard, *but left the individual states free to extend* traditional tort theories such as claims arising from fraud or deception to commercial e-mail communication." *Gordon*, 575 F.3d at 1063. So, the national standard remains intact and states, like Washington, are free to enact laws that "prohibit[] falsity **or** deception in any portion of a commercial electronic mail message," 15 U.S.C. § 7707(b)(1), with the distinction that such prohibitions cannot create liability for "bare immaterial error." *Gordon*, 575 F.3d at 1061. Indeed, if conflict preemption were to apply whenever a state imposes liability beyond the baseline provided by CAN-SPAM, the statute's express preservation of state laws targeting deception would be rendered meaningless.

Moreover, CEMA does not obstruct Congress's objectives, it reinforces them. Rather than frustrate CAN-SPAM's objectives, CEMA advances them by deterring anti-consumer conduct and providing additional enforcement mechanisms.

This further reflects that Dooney's assertions about the CAN-SPAM "national standard" have nothing to do with whether CEMA injects "impossibility" or a true "obstacle" to the execution of the federal law. It has failed to make this showing, including through its rehashed, inapposite arguments regarding materiality and the common law fraud elements of scienter and

intentionality, addressed *supra* Sections IV(A)(i), (ii). There is no conflict preemption here.

**B. Plaintiff states a claim under CEMA.**

Under CEMA, a company is liable for "initiat[ing] the transmission, conspir[ing] with another to initiate the transmission, or assist[ing] the transmission, of a commercial electronic mail message" to a Washington resident that "[c]ontains false or misleading information in the subject line." RCW § 19.190.020(1)(b). Of course, this language undermines Dooney's proposition that Plaintiff must demonstrate "actionably false statement[s] of fact" to plead its liability under CEMA. Mot., 20-22. In fact, under CEMA, "spammers" like Dooney "must use an accurate" and "nonmisleading" email subject heading, or otherwise face liability. *Brown*, 4 Wash. 3d at 588.[6]

**i. Plaintiff has pled that she received emails with subject headings that violate CEMA.**

Nonetheless, Dooney is likewise wrong that "none" of the pleaded email subject headlines made false representations. The Complaint is littered with spam emails sent by Dooney that contain "false" *and* "misleading" in the subject line. RCW § 19.190.020(1)(b). As the Supreme Court of Washington makes clear: CEMA focuses on "representations of fact—like the duration or availability of a promotion, its terms and nature, the cost of goods, and other facts Washington residents would depend on in making their consumer decisions." *Brown*, 4 Wash. 3d at 596 (emphasis added). Thus, Dooney's false statements or misrepresentations as to the "duration or availability" of a deal, as well as the "terms" of the deal are straightforward violations of the statute. Plaintiff has sufficiently pled her CEMA claims against Dooney.

*To illustrate:* Dooney sent two emails sent on November 30, 2025, advertising its "Black

[6] Dooney curiously points to *In re Pac. Mkt. Int'l, LLC, Stanley Tumbler Litig.*, 764 F. Supp. 3d 1026, 1036 (W.D. Wash. 2025), a case that not once mentions CEMA, and *does not* require a plaintiff to plead falsity under the CPA. *Id.* (act is "unfair or deceptive" under CPA if it "is likely to mislead a reasonable consumer").

Friday" sale for "up to 70% off", with the subject lines: "*Last Call!* Shop All Our Black Friday Deals Before Time Runs Out," and "*One More Day to Save*: Up to 70% Off For Black Friday." Compl., ¶¶ 72, 74, 95, 96. So Dooney told consumers that November 30th was the "last" and "one" day for the up-to 70% off sale, when the very next day (December 1), it offered a sitewide sale that encompassed the 70% off deal and offered even more ("up to 75% off"). *Id.* at ¶ 76 Put literally, "last" means "final"[7] and "one" means one, not two, three or more. And because November 30th was not the "last" or final day, or the "one" day, that customers could take advantage of 70% off, these statements are—at best for Dooney—misleading under CEMA. *See, e.g.*, *id.* at ¶¶ 55-58 (claiming "Last Chance!" for "Summer Fun" sale on July 28, 2024 when, on July 29, "Surprise! One More Day to Shop Summer Fun").

Likewise, the email that Dooney sent on December 1, 2025, advertising its Cyber Monday sale for "up to 75% off" (*id.* at ¶ 76) was itself false and misleading, urging in the subject heading: "Only Hours Left: Cyber Monday Ends Soon," *id.* at ¶¶ 78, 97, when, in fact, it "extended" the "Cyber Monday" sale the next day. *Id.* at ¶ 80; *see id.* at ¶ 79. When there are "only hours" left, a consumer understands it to mean hours in a day—not hours left in an indeterminate number of days. Dooney misled consumers that there were an ever-decreasing 24 hours to take advantage of the Cyber Monday deal, but in fact, they had a whole other day. This "final hours" and "hours left" sleight of hand is a favorite Dooney marketing ploy. *See, e.g.*, *id.* at ¶¶ 59-63 (claiming, on December 2, 2024, "final hours" for the "Cyber Monday" deal that was "EXTENDED" on December 3); *id.* at ¶¶ 47-50 ("Final 24 Hours" and "Hours Left!" on November 27, 2023 for a Cyber Monday deal that continued on November 28); *id.* at ¶¶ 51-54 ("Hours Left" for Dooney's "Spring Fling Sale" on March 11, 2024 when on March 12, "Surprise! The Spring Fling Sale

---

[7] *See* Merriam-Webster Dictionary (definition of "Last" is "as in final" https://www.merriam-webster.com/thesaurus/last (accessed on April 2, 2026).

Continues for One More Day!”).

It’s simple: Dooney uses its marketing email subject lines to create false or misleading urgency about sales that do not end on the day that they represent as the deadline. Dooney’s assertions otherwise do not persuade. Mot., 21-22. *First*, the terms “last chance” and “final hours,” discussed *supra*, have specific meaning. “Last” and “Final” are not vague; they mean the end. Even if there is some stretch in their literal meaning, CEMA encompasses representations that are “misleading,” even if not necessarily false. *Second*, the pleaded emails aren’t referring to “vague” sales. The Complaint is clear that the subject headings regard specific sales (*e.g.*, “Cyber Monday,” “Black Friday,” “Spring Fling,” “Summer Fun” sales), with associated, specific discounts, that are continued beyond the conveyed deadline. Put another way, Dooney said *this sale* would end on *this day*, when in fact, *this sale* ended on *another day*.

Moreover, the fact that Dooney said “One More Day” on its Black Friday sale for “up to 70% off” and then offered a Cyber Monday sale for “up to 75% off” does not render the latter a *different* deal under CEMA. The question is whether Dooney made “representations of fact” that were misleading about the “duration or availability” or the “terms” of the promotion. *Brown*, 4 Wash. 3d at 596 (emphasis added). Here, Dooney said that there was just *one more day* to obtain “up to 70%” off, and that wasn’t true, where the subsequent “up to 75% off” deal encompassed the prior one. It misled consumers about these “facts” that they “depend on in making their [ ] decisions,” facts that are not mitigated by Dooney’s *naming* of one deal “Black Friday” and another deal “Cyber Monday.” *Brown*, 4 Wash. 3d at 596.

Finally, Dooney’s invitation to the Court to defy the governing standard and construe the well-pled facts *against* Plaintiff should be rejected. *See Littlejohn*, 2024 WL 4451955, at *3. There is no basis in the Complaint for its “alternative explanation” of promotion “extensions” based on

"changed circumstances," aptly reflected in Dooney's failure to cite a single pleading in support of this argument. Mot., 22. By contrast, there are *extensive* pleadings that these falsely urgent deal "deadlines" were an intentional "tactic," "strategy," "technique," or "practice" designed to lure consumers to act quickly. Compl., ¶¶. 4, 45, 50, 63, 70, 82[8]. Dooney's only case is readily distinguishable. In *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, Plaintiff's *own* allegations undermined their conclusion of intent to defraud. 751 F.3d 990, 998–99 (9th Cir. 2014); *see id.* at 996 ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*."). Here, Dooney's alternative explanation invites the Court to believe that sophisticated online retailers conceive and market significant promotions in less than a day's time, rendering prior representations of deal availability false. This alternative explanation has no basis in the Complaint. Nor is it plausible.

**C. Plaintiff's CPA claim survives.**

Dooney's only argument for dismissal of Plaintiff's CPA claims is that they stand or fall with Plaintiff's CEMA claims. *See* Mot., 23. As Plaintiff's CEMA claims survive for the reasons given above, so too do their CPA claims.

**V. CONCLUSION**

The Court should deny Dooney's motion to dismiss.

*[Counsel signatures to follow on next page.]*

[8]At this stage, any "alternative explanation" offered by Defendant is neither appropriate nor warranted. *See, e.g.*, *Ho v. Garland*, 106 F.4th 47, 54 (D.C. Cir. 2024) ("A 'complaint survives a motion to dismiss' when 'there are two alternative explanations, one advanced by the defendant, and the other advanced by the plaintiff, both of which are plausible.'" (quoting *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021))); *Hughes v. Nw. Univ.*, 63 F.4th 615, 629 (7th Cir. 2023) ("Where alternative inferences are in equipoise—that is, where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss.").

Date: April 3, 2026

Respectfully submitted:

By: /s/ Samuel J. Strauss
Samuel J. Strauss WSBA No. #46971
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
Fax: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

*I certify that this memorandum contains 6,673 words in compliance with the Local Civil Rules.*

Lynn A. Toops (*pro hac vice*)
Natalie A. Lyons*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

J. Gerard Stranch, IV (*pro hac vice*)
Michael C. Tackeff (*pro hac vice*)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com

*Counsel for Plaintiff and the Putative Class*

*** Applications for admission *pro hac vice* forthcoming**

**<u>CERTIFICATE OF SERVICE</u>**

I, Samuel J. Strauss, hereby certify that on April 3, 2026, I caused the foregoing to be electronically filed with the Court using the Court's CM/ECF system which will send an electronic copy to all parties and/or their counsel of record.

DATED this 3rd day of April, 2026.

By*:* *<u>/s/ Samuel J. Strauss</u>*
Samuel J. Strauss WSBA No. #46971
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
sam@straussborrelli.com